United States District Court
For the Northern District of California

1
2
3
4
5
6
7                    IN THE UNITED STATES DISTRICT COURT

8               FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   ROBERT DALTON RUSH,                    No. C 05-4143 CRB

11              Petitioner,                 **MEMORANDUM AND ORDER
                                            DENYING PETITION FOR HABEAS**
12      v.                                  **CORPUS**

13   ANTHONY P. KANE,

14              Respondent.
                                       /
15   ───────────────────────────────

16         In September of 1987, after a jury trial in the Superior Court of the State of California,

17   Petitioner Robert Rush was convicted of second degree murder with the use of a firearm.

18   Petitioner was sentenced to 17 years to life and is currently incarcerated at the Correctional

19   Training Facility in Soledad, California.  On March 5, 2003, the Board of Prison Terms (the

20   "Board") denied Petitioner parole.  Petitioner challenges the constitutionality of the Board's

21   decision and seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the reasons set

22   forth below, the petition is DENIED.

23                              **I. BACKGROUND**

24   **A.      The Commitment Offense**

25         In July 1986 Petitioner murdered his roommate John Heinz.  In the days leading up to

26   the murder, Petitioner and Heinz had been bickering over household matters.  In particular,

27   Heinz had accused Petitioner of using his shampoo.  Petitioner, for his part, thought that

28   Heinz may have instructed his dog to attack Petitioner's dog.  On the day of the murder,

     Petitioner and Heinz got into a physical altercation that Petitioner claims left him with a

bloody nose and lip.  During a pause in the tussle, Petitioner procured a .22 caliber rifle from his bedroom and shot Heinz multiple times at close range, emptying the rifle's clip.

Shortly thereafter, another one of Petitioner's roommates, Mark Hoy, came home.  Hoy helped Petitioner dispose of Heinz' body.  After checking Heinz' pulse to make sure he was dead, Petitioner and Hoy wrapped the body in plastic and then in a sleeping bag.  They buried the body in a nearby canyon, but not before removing Heinz' ring and wallet.  Hoy reportedly pawned the ring and, after removing the money inside, tossed Heinz' wallet off a cliff.  Petitioner and Hoy then abandoned Heinz' truck in a parking lot.  On their way home they stopped at a bar to have a few drinks with Heinz' money.

**B.     The 2003 Parole Eligibility Hearing**

Petitioner appeared before the Board on March 5, 2003 in a hearing to determine his eligibility for parole.  The Board denied parole after making the requisite finding that Petitioner continued to pose "an unreasonable risk of danger to society or a threat to public safety if released from prison."  Resp. Ex. 2, at 95; see Cal. Code Regs., tit. 15  § 2402(a).  In so concluding, the Board relied on the nature of Petitioner's commitment offense.  Id.  The Board described the manner of that offense as "dispassionate and calculated" as well as "cruel and callous."  Id.  The Board found the crime's motive "inexplicable and very trivial in relation to the offense."  Id.  In reaching its decision, the Board also noted a 2002 report from Petitioner's correctional counselor which concluded that, if released, Petitioner would "pose an unpredictable degree of threat to the public."  Id. at 98.

The Board acknowledged Petitioner's exemplary prison record, including its utter lack of disciplinary infractions.  Id. at 97.  The Board also commended Petitioner for continuing his education and earning both BA and MA degrees while incarcerated.  Id.  Nevertheless, these positive aspects of Petitioner's behavior were not deemed to outweigh those factors indicating his unsuitability for parole.  Id.  The Board encouraged Petitioner to continue his participation in "self-help" programming and deferred any future consideration of Petitioner's parole for 2 years.

**II. PROCEDURAL HISTORY**

On September 9, 2004, Petitioner filed a petition for a writ of habeas corpus in the California Superior Court for the County of San Bernardino.  The Superior Court denied his petition on the merits, concluding that the record contained "some evidence" to support the Board's finding that petitioner was unsuitable for parole.  Resp. Ex. 5, at 4.

Petitioner timely appealed to the California Court of Appeal, which summarily denied the petition.  Petitioner then filed a petition for review with the California Supreme Court, which denied review.  Petitioner filed the instant petition on October 7, 2005.  Respondent filed a motion to dismiss, arguing that several of Petitioner's claims were not exhausted in state court.  Respondent's motion was granted in part and denied in part by this Court on March 16, 2007.  Petitioner's exhausted claims are discussed below.

**III. STANDARD OF REVIEW**

The Court may entertain a petition for a writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Id. § 2254(d).

Under the "contrary to" clause, a federal habeas court must only consider as clearly established federal law "the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision."  Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).  "While circuit law may be 'persuasive authority' for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state

3

1   courts and only those holdings need be reasonably applied." <u>Id.</u> (internal quotations omitted.)

2   Under the "unreasonable application" clause, a federal habeas court "may not issue the writ

3   simply because that court concludes in its independent judgment that the relevant state-court

4   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

5   application must also be unreasonable." <u>Williams</u>, 529 U.S. at 411.

6   　　　The state court decision to which 2254(d) applies is the "last reasoned decision" of the

7   state court.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991); <u>Barker v. Fleming</u>, 423

8   F.3d 1085, 1091-92 (9th Cir. 2005).  When determining whether the last reasoned decision

9   affirming a denial of parole merits habeas relief, the Ninth Circuit focuses on the reasons set

10  forth in the denial.  <u>See</u> <u>Rosas v. Nielson</u>, 428 F.3d 1229, 1232 (9th Cir. 2005).  If the

11  determination of unsuitability for parole is supported by "some evidence, with some indicia of

12  reliability," the state court decision affirming the denial neither unreasonably applies federal

13  law nor rests on an unreasonable application of federal law.  <u>See</u> <u>id.</u> at 1232-33.

## IV. DISCUSSION

15  　　　Petitioner advances three claims.  First, Petitioner contends that the Board's negative

16  parole suitability determination denied him due process of law.  Second, Petitioner argues that

17  the Board made its own factual findings and thus enhanced his sentence in violation of

18  <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000) and <u>Blakely v. Washington</u>, 542 U.S. 296

19  (2004).  Third, Petitioner claims that he is a victim of an unlawful "no parole" policy.

20  　　　**A.　　Due Process Claims**

21  　　　Petitioner claims that the Board's decision to deny parole violated the Due Process

22  Clause.  He argues that the Board's decision was not supported by "some" evidence and that

23  the Board impermissibly relied on the facts of his commitment offense.  Petitioner contends

24  that these errors deprived him of a federally protected liberty interest created by California's

25  parole regime.

26  　　　 It is well-established that there is "no constitutional or inherent right of a convicted

27  person to be conditionally released before the expiration of a valid sentence." <u>Greenholtz v.</u>

28  <u>Inmates of Nebraska Penal and Corr. Complex</u>, 442 U.S. 1, 7 (1979).  Nevertheless, a state

can "create a liberty interest protected by the due process guarantees" when it's parole scheme employs "statutory language [that] itself creates a protectible expectation of parole." Id. at 11-12.  In California, the Penal Code provides that "prior to [an] inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate and *shall normally set a parole release date*."  Cal. Penal Code § 3041(a) (emphasis added).  The Ninth Circuit has repeatedly held that this mandatory language vests inmates with a cognizable liberty interest in a parole date.  See, e.g., Sass v. Cal. Bd. Of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006).

Because inmates have a liberty interest in a parole date, the deprivation of that interest must comport with due process.  Sass, 461 F.3d at 1128.  It is well-established that a Board's denial of parole violates due process if the decision is not supported by "some" evidence. Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007), as amended, 2007 WL 2027359 (9th Cir. July 13, 2007); Sass, 461 F.3d at 1128-29.  As previously noted, to deny parole, the Board must conclude that the inmate before it poses "an unreasonable risk of danger to society if released from prison."  Cal. Code Regs., tit. 15  § 2402(a).  Thus, an inmate is denied due process if the Board's "unreasonable risk" determination is not supported by "some" evidence.  Irons, 479 F.3d 662-63.

**1.     The State Court Applied the Correct "Some" Evidence Standard.**

The last reasoned state decision in this case is the California Superior Court's Order denying Petitioner habeas relief.  Resp. Ex. 5; see Barker, 423 F.3d at 1091-92 (federal habeas review is of last reasoned state court decision).  Petitioner claims that the state court's decision erroneously applied a "some" evidence standard to his due process claim.  According to Petitioner, the state court should have applied a "substantial" evidence standard, and its failure to do so was contrary to established federal law.  Petitioner's argument is unpersuasive.

The Supreme Court has never held that a parole board's suitability determination must be supported by "substantial" evidence.  Rather, as the Ninth Circuit has repeatedly stated, the "Supreme Court has clearly established that a parole board's decision deprives a prisoner of

due process with respect to [his or her liberty] interest if the board's decision is not supported by 'some evidence in the record.'" <u>Irons</u>, 479 F.3d at 662 (citing <u>Superintendent v. Hill</u>, 472 U.S. 445, 457, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)); <u>accord</u> <u>Sass</u>, 461 F.3d at 1128-29. Accordingly, this Court cannot say that the state court's application of a "some" evidence standard was contrary to, or involved an unreasonable application of, established Supreme Court precedent.

### 2.   The Board's Decision was Supported by "Some" Evidence.

Petitioner argues that even if the "some" evidence standard applies, the state court's application of that standard was objectively unreasonable.  Petitioner contends that there was "no" evidence to support the Board's determination that he posed a continued danger to society if released.  This claim must also be rejected.

As the state court summarized, the Board found Petitioner unsuitable for parole based on the characteristics of his commitment offense.[1]  In particular, the Board determined that (1) the crime was carried out in a "cruel and callous" manner; (2) the crime was carried out in a "dispassionate and calculated" manner; and, (3) the motive for the crime was "inexplicable and very trivial in relation to the nature of the crime."  Resp. Ex. 5, at 3.  Each of these factors is identified by California law as an indication of an inmate's unsuitability for parole.  Cal. Code Regs., tit. 15 § 2402(c)(1)(B),(D),(E).

The state court determined that there was "some" evidence supporting each of these findings.  Resp. Ex. 5, at 4.  The court emphasized that Petitioner had an opportunity to withdraw from his altercation with Heinz but instead armed himself with a rifle, entered Heinz' bedroom, and emptied the rifle's entire clip into the victim.  <u>Id.</u>  The court noted Petitioner's deliberate efforts to dispose of the body and abandon Heinz' vehicle.  <u>Id.</u>  Further, the court noted the apparent callousness of using money taken from Heinz' wallet to go out

---

[1] The Board also relied on a 2002 report authored by Petitioner's correctional officer that recommended that the Board deny Petitioner a parole date.  Resp. Ex. 2, at 98.  The correctional officer's  report, however, drew its conclusion entirely from the facts of Petitioner's commitment offense.  Resp. Ex. 4, at 2-4.  Thus, Petitioner is correct that the Board's decision rested exclusively on the immutable facts of his offense.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   for a drink.  Id.  Finally, the state court placed particular emphasis on the inexplicable fact that

2   the murder was provoked by a fight regarding a dog and the unauthorized use of shampoo.  Id.

3        The state court also acknowledged that Petitioner met several of the criterion for parole

4   suitability.  Id. at 4; see Cal. Code Regs., tit. 15 § 2402(d).  Specifically, Petitioner has by all

5   accounts been a model inmate, earning both BA and MA degrees while in prison and

6   incurring no disciplinary infractions.  See id. at § 2402(d)(9).  Petitioner also has no prior

7   criminal history and discussed at his parole hearing a realistic plan for reintegrating with

8   society upon release.  See id. at § 2402(d)(1),(6),(8).

9        On the balance of all factors, however, the state court held that the Board's

10  unsuitability determination was supported by "some" evidence.  Resp. Ex. 5, at 4.  This is not

11  an unreasonable application of the "some" evidence standard.  The circumstances of

12  Petitioner's crime, as summarized by the state court, adequately support the conclusion that

13  the crime was carried out in a cruel, callous, deliberate and calculated manner.  Of particular

14  force is evidence that Petitioner had every opportunity to walk away from the conflict but

15  chose instead to procure a rifle from his room and empty its entire clip into the victim.  The

16  record also amply demonstrates that the motive for the crime–unauthorized shampoo use and

17  a dog fight–was extremely trivial and grossly out of step with the seriousness of the offense.

18  The presence of positive suitability factors, while significant, does not tip the scales and

19  render the state court's application of the "some" evidence standard objectively unreasonable.

20  See Irons, 479 F.3d at 660-61, 663 (callousness of offense and trivial motive "some" evidence

21  of unsuitability despite positive showing on virtually all other suitability factors); In re

22  Dannenberg, 34 Cal. 4th 1061, 1074-75 (2005) (substantially same).

### 3.    The Board's Reliance on the Immutable Circumstances of Petitioner's Commitment Offense Did Not Violate Due Process.

24  Petitioner argues that even if there is "some" evidence supporting the Board's

25  determination that he is unsuitable for parole, the Board's exclusive reliance on the immutable

26  circumstances of his commitment offense nonetheless violated due process.  This argument

27  touches on a murky and fast-developing area of law.  Nevertheless, based on the most recent

28

**United States District Court**
For the Northern District of California

1   pronouncements from the Ninth Circuit, and the specific facts of this case, it is clear that

2   Petitioner's argument must be rejected.

3       In any event, the Ninth Circuit has stated that reliance "on an unchanging factor [such

4   as] the circumstance of the offense . . . runs contrary to the rehabilitative goals espoused by

5   the prison system and could result in a due process violation."  Biggs v. Terhune, 334 F.3d at

6   910, 917 (9th Cir. 2003);  accord Sass, 461 F.3d at 1129.  Additionally, in Irons the Ninth

7   Circuit again stated that "in some cases, indefinite detention based solely on an inmate's

8   commitment offense, regardless of the extent of his rehabilitation, will at some point violate

9   due process, given the liberty interest in parole that flows from the relevant California

10   statutes."  479 F.3d at 665.  However, in Biggs, Irons and Sass this language was dicta, as

11   each court in fact found no violation of due process despite the Board's exclusive reliance on

12   the petitioner's commitment offense.  See Biggs, 334 F.3d at 913;  Sass, 461 F.3d at 1129;

13   Irons, 479 F.3d at 664-65.  As such, there is no authoritative case law that requires that this

14   Court find a violation of Petitioner's due process rights.

15       The Ninth Circuit's most recent treatment of this issue strongly suggests that while

16   reliance on an inmate's commitment offense may potentially violate due process, the violation

17   does not ripen until the expiration of the inmate's minimum sentence.  See Irons, 479 F.3d at

18   664-65.  Irons is strikingly similar to the case at bar.  The habeas petitioner in Irons had been

19   convicted of second degree murder in the death of his roommate.  Id. at 660.  The killing was

20   provoked by an angry argument during which the petitioner accused the victim of stealing

21   from him.  Id.  Sometime during this altercation, the petitioner procured a gun from his

22   bedroom, fired 12 rounds into the victim and then stabbed him twice in the back.  Id.  While

23   incarcerated, the petitioner in Irons demonstrated "exemplary" behavior, received positive

24   psychological evaluations, and was able to articulate a solid plan for the future.  Id. at 661-62.

25   Nevertheless, the Board denied parole exclusively on the basis of the "callous" nature of the

26   petitioner's commitment offense as well as its "trivial" motive.  Id. at 663-65.

27       The Irons court held that the Board's denial of parole did not violate due process.  In so

28   holding, the court placed special emphasis on the fact that, as in Biggs and Sass, the petitioner

**United States District Court**
For the Northern District of California

1   at issue had not served the statutory minimum number of years for his offense at the time of

2   the Board's negative parole determination.  Id.  at 665.  The court also acknowledged the

3   callousness of the petitioner's commitment offense and the fact that the Sass court had upheld

4   the Board's exclusive reliance on a far less egregious offense.  Id. at 664-65 (Sass was

5   convicted of second degree murder arising from a hit and run incident and felony drunken

6   driving.).  In light of these factors, the court concluded that "[a]ll we held in [Biggs and Sass]

7   and all we hold today, therefore, is that given the particular circumstances of the offenses in

8   these cases, due process was not violated when these prisoners were deemed unsuitable for

9   parole prior to the expiration of their minimum terms."  Id.

10          Here, at the time of the Board's suitability decision, Petitioner had served 16.5 of his

11   17 year minimum term.[2]  Therefore, in light of Biggs, Sass and Irons, the Court is disinclined

12   to conclude that the Board's reliance on the immutable characteristics of Petitioner's

13   commitment offense violated due process.[3]  This conclusion gains additional support from the

14   apparent callousness of Petitioner's offense as well as the exceedingly trivial provocations

15   that preceded it.  That is, Petitioner's commitment offense is probative of his future danger to

16   society.  See Brown v. Kane, No. 05-5188 CRB, 2007 WL 1373038, at * 7 (N.D. Cal. May 8,

17   2007) (commitment crime that is not probative of dangerous recidivism is less likely to

18   constitute "some" evidence supporting parole denial).  Because Sass' less callous offense was

19

20

21          [2] Petitioner contends that at the time of the challenged Board decision, he had served his minimum 17 year sentence.  The record does not bear out this contention.  Petitioner was sentenced to a 17 year term on November 24, 1987.  Resp. Ex. 1.  Accounting for time served prior to his 1987

22   sentencing, Petitioner's 17 years were completed in late July of 2003.  The challenged parole hearing, however, took place on March 5, 2003 and thus within Petitioner's 17 year term.  Moreover, even if

23   Petitioner had barely served his 17 year sentence at the time of the Board's decision, this Court would not be inclined to find that the Board's continued reliance on his commitment offense amounted to a due

24   process violation.  See Leigh v. Kane, No. 06-2947 CRB, 2007 WL 2417374 (N.D. Cal. Aug. 24, 2007) ("[T]here is no authoritative case law that clearly establishes that [such a] factual scenario amounts to

25   a due process violation.").

26          [3] The fact that Petitioner has not served his minimum sentence distinguishes this case from the Court's prior decision in Brown v. Kane, No. 05-5188 CRB, 2007 WL 1373038 (N.D. Cal. May 8,

27   2007).  In Brown, at the time of the challenged parole determination, petitioner had served a "substantial amount of time beyond his minimal sentence."  Id. at * 6.  Indeed, in Brown, the petitioner had served

28   10 years more than his 15 year minimum sentence.  Id.

1  deemed "some" evidence that he posed a continuing risk to society, this Court cannot reach a

2  different result with respect to Petitioner.  See Irons, 479 F.3d at 664-65.

3       For these reasons, the Board's denial of parole cannot, at this point, be deemed to have

4  violated due process by relying on the immutable circumstances of Petitioner's offense.

5  Nevertheless, the Court reaches no conclusion about whether the unchanging facts of

6  Petitioner's crime would be sufficient to sustain the denial of a release date at any future

7  parole hearing.  See Sass, 461 F.3d at 1129 ("[I]t is not our function to speculate about how

8  future parole hearings could proceed.").

9       **B.    No Authority Supports Petitioner's Claim that the Apprendi Line of Cases**
         **Apply in the Parole Context.**

10      In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction,

11 any fact that increases the penalty for a crime beyond the prescribed statutory maximum must

12 be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.  In Blakely,

13 the Court held that for Apprendi purposes the "statutory maximum" is the "maximum

14 sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or

15 admitted by the defendant."  Blakely, 542 U.S. at 303.

16      Petitioner contends that the parole decision at issue violated Apprendi and Blakely

17 because it rested on the Board's characterization of the crime and not facts found by a jury.

18 Specifically, as the petitioner recounts, the Board denied parole after determining that the

19 commitment offense was carried out in a "cruel," "callous," "dispassionate," and "calculated"

20 manner.  Resp. Ex. 2, at 95.  The Board also noted that the crime sprung from an

21 "inexplicable" and "trivial" motive.  Id.  Petitioner contends that these characterizations of the

22 underlying offense operated as sentence enhancements in violation Apprendi and Blakely.

23      This argument must be rejected because Petitioner cites to no authority, let alone

24 established Supreme Court precedent, indicating that Apprendi and its progeny apply to

25 parole suitability determinations.  Consequently, this Court simply cannot say (as it must

26 under AEDPA) that the state court's failure to apply Apprendi was "contrary to," or involved

27 an "unreasonable application" of, established Supreme Court precedent.

28

**United States District Court**
For the Northern District of California

Moreover, Petitioner's argument misapprehends the <u>Apprendi</u> line of cases.  As <u>Blakely</u> clarified, the <u>Apprendi</u> rationale does not apply to indeterminate sentencing within the sentence range permitted by a jury's verdict.  <u>Id.</u> at 308-09.  <u>Blakely</u> holds that even though an indeterminate sentencing regime allows for judicial fact-finding, it is constitutionally permissible because it does not infringe on the province of the jury.  <u>Id.</u>  Thus, so long as he stays within the sentencing range the jury's verdict will allow, a "judge (*like a parole board*) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion."  <u>Id.</u> at 309 (emphasis added).

Here, the Board's negative parole suitability determination did not impose a term beyond the 17 years to life sentence that Petitioner's conviction required under California law.  Thus, whatever fact-finding the Board engaged in did not result in a sentence beyond that which the jury's verdict would allow.  As such, even if <u>Apprendi</u> and <u>Blakely</u> applied in the parole context, the logic of those cases was not violated by the parole suitability determination at issue.

**C.     No Evidence in the Record Supports Petitioner's "No Parole" Policy Claim**

Petitioner claims that the Board's negative parole determination was the product of a gubernatorial "no parole" policy.  Specifically, Petitioner contends that former California governors Pete Wilson (1991-1999) and Gray Davis (1999-2003) established a "no parole" policy for inmates convicted of murder and that this policy trickled down sub rosa to individual Board decisions.  To support this claim, Petitioner relies on the extensive evidentiary record developed in  <u>Melvyn H. Coleman v. Board of Prison Terms</u>, No. 96-0783, 2005 WL 4629202 (E.D. Cal. Dec. 2, 2005).

In <u>Coleman</u>, the court found that the habeas petitioner before it had "present[ed] a convincing case that a blanket policy against parole for murderers" affected the fairness and impartiality of the Board during his 1995 parole hearing.  <u>Id.</u> at * 4.  The court ordered a new hearing to be conducted "free of any prejudice stemming from a gubernatorial policy against parole for murderers."  <u>Id.</u>  Accordingly, in July of 2005, the Board held a hearing at which the petitioner was again found unsuitable for parole.  <u>Coleman v. Bd. of Prison Terms</u>, Nos.

**United States District Court**
For the Northern District of California

05-17380, 06-15478, 2007 WL 1073774, at * 1 (9th Cir. Apr. 6, 2007).  This decision was then affirmed by the district court.  Id.

In finding that petitioner's 1995 parole hearing was affected by a "no-parole" policy, the Coleman court relied substantially on the deposition testimony of two former Board commissioners.  Id. at * 2.  According to the Coleman court, the commissioners' testimony tended to show that former governor Pete Wilson initiated a sub rosa "no-parole" policy that affected the petitioner's 1995 parole hearing.  Id.  The court cited additional evidence in the record which it found to suggest that the policy carried over to governor Gray Davis' administration.  In particular, the court noted that between the years of 1992 and 2001, a period spanning both administrations, less than one percent of inmates convicted of murder were released on parole.  Id.[4]

Petitioner proposes a number of ways in which this Court should apply the evidentiary record developed in Coleman.  First, Petitioner asks the Court to take judicial notice of Coleman's factual findings and apply them to the case at hand.  This request must be denied.  It is well-established that the "[f]actual findings in one case ordinarily are not admissible for their truth in another case through judicial notice."  Wyatt v. Terhune,  315 F.3d 1108, 1114 n.5 (9th Cir. 2003); accord Lasar v. Ford Motor Co., 399 F.3d 1101, 1117 n.14 (9th Cir. 2005).  Second, Petitioner's submissions to this Court also appear to request the application of the doctrine of offensive non-mutual collateral estoppel to establish that his 2003 Board decision was affected by a "no parole" policy.  This the Court cannot do.  The Supreme Court has unanimously rejected the application of offensive non-mutual collateral estoppel against the government.  United States v. Mendoza, 464 U.S. 154, 160 (1984).

---

[4] The Coleman court also considered an April, 9 1999  Los Angeles Times piece which stated the following:

> governor [Davis] was adamant that he believes murderers-even those with second-degree convictions-should serve at least a life sentence in prison.  Asked whether extenuating circumstances should be a factor in murder sentences, the governor was blunt: "No. Zero. They . . . must not have been listening when I was campaigning. . . .  If you take someone else's life, forget it.  I just think people dismiss what I said in the campaign as either political hyperbole or something that I would back away from . . . .  We are doing exactly what we said we were going to do."

Id. at * 2.

1    Perhaps recognizing the dubiousness of these first two applications of <u>Coleman</u>,

2  Petitioner has requested an evidentiary hearing in which he can present the evidentiary

3  exhibits from <u>Coleman</u>.  This request must be denied because even if the evidentiary record

4  from <u>Coleman</u> were properly before the Court, it could not be found probative of the Board's

5  2003 decision at issue.  As the Ninth Circuit recently stated, the evidence from the <u>Coleman</u>

6  case "was specific and limited to Coleman's 1995 parole hearing."  <u>Coleman v. Bd. of Prison</u>

7  <u>Terms</u>, Nos. 05-17380, 06-15478, 2007 WL 1073774, at * 2 n.5 (9th Cir. Apr. 6, 2007).  The

8  evidence from <u>Coleman</u> simply cannot be "extrapolated to parole challenges by other

9  prisoners," particularly those, like the one at issue, that arise from a Board decision that took

10  place almost a decade after the infirm decision in <u>Coleman</u>.  <u>Id.</u>  Accordingly, Petitioner has

11  presented no cognizable evidence that his 2003 parole hearing was affected by a gubernatorial

12  "no parole" policy.[5]

13    Accordingly, Petitioner has presented no cognizable evidence that his 2003 parole

14  hearing was affected by a gubernatorial "no parole" policy.  The state court's rejection of this

15  claim was therefore neither contrary to, nor involved an unreasonable application of,

16  established federal law.

**CONCLUSION**

18    For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

19  .

20    **IT IS SO ORDERED.**

23  Dated: November 19 , 2007          _____
                                      CHARLES  R. BREYER
                                      UNITED STATES DISTRICT JUDGE

---

[5]  Moreover, if this Court were to hold that Petitioner's 2003 hearing was affected by a "no parole" policy, the remedy, as in <u>Coleman</u>, would be a fair parole hearing unaffected by the gubernatorial policy.  <u>See</u> <u>Melvyn H. Coleman v. Board of Prison Terms</u>, 2005 WL 4629202, at * 1 (E.D. Cal. Dec. 2, 2005).  But as Petitioner acknowledges, he had a hearing in 2005 at which he was again denied parole.  Pet. Summary of Issues, at *4 n.4.  That hearing was conducted under Governor Schwarzenegger's administration, and there is absolutely no indication that the "no parole" policy identified by the <u>Coleman</u> court carried over to the Schwarzenegger administration.  Thus, the fair hearing this Court could order has already been provided, and in this sense, Petitioner's "no parole" policy claim is moot.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California